FILED

12/21/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 26, 2017 Session

**MARLON DUANE KISER v. STATE OF TENNESSEE**

Appeal from the Criminal Court for Hamilton County
No. 274423   Don W. Poole, Judge

————————————————————

**No. E2016-01644-CCA-R3-PD**

————————————————————

The Petitioner, Marlon Duane Kiser, appeals the Hamilton County Criminal Court's denial of his petition for post-conviction relief challenging his 2003 first degree murder conviction and resulting death sentence. On appeal, the Petitioner alleges that the post-conviction court should have granted post-conviction relief based upon allegations of the ineffective assistance of counsel during the guilt-innocence phase of the trial, the original trial judge's failure to recuse himself for an inappropriate relationship with a victim-witness coordinator, the perjured testimony of a witness, and newly-discovered evidence raising doubt as to his guilt. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Paul Bruno, Nashville, Tennessee, and Luke A. Evans, Murfreesboro, Tennessee, for the appellant, Marlon Duane Kiser.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; and Neil Pinkston, District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**Procedural History**

In October 2001, a Hamilton County grand jury indicted the Petitioner for first degree premeditated murder, first degree felony murder committed in the perpetration of a theft, and first degree felony murder committed in the perpetration of an arson

involving the September 6, 2001 shooting death of Hamilton County Sheriff's Office Deputy Donald Kenneth Bond, Jr. At the November 2003 trial, the jury convicted the Petitioner of all counts. The jury sentenced the Petitioner to death on each count, finding beyond a reasonable doubt the existence of one aggravating circumstance: that the murder was committed against a law enforcement officer while engaged in the performance of his official duties, Tenn. Code Ann. § 39-13-204(i)(9) (Supp. 2001), and that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt. This court affirmed the Petitioner's convictions and sentence on direct appeal but remanded the case to the trial court for the merger of the first degree murder convictions and entry of a single judgment of conviction for first degree murder. State v. Marlon Duane Kiser, No. E2005-02406-CCA-R3-DD, 2007 WL 420793 (Tenn. Crim. App., at Knoxville, Nov. 29, 2007). On May 13, 2009, the Tennessee Supreme Court affirmed the Petitioner's convictions and sentence on automatic direct review. State v. Kiser, 284 S.W.3d 227 (Tenn. 2009).

On December 28, 2009, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended petition on June 4, 2012.[1] Following the substitution of counsel, the Petitioner filed a second amended petition on June 30, 2014,[2] and a "fourth" amended petition on December 8, 2014.[3] In addition to raising various constitutional challenges to the imposition of the death penalty in this case and to Tennessee's death penalty statute in general, the collective petition includes allegations of ineffective assistance of counsel relating to trial counsel's investigation and presentation of evidence surrounding the Petitioner's claim that another individual, Mike Chattin, shot and killed Deputy Bond;

---

[1] The first amended petition was not signed or verified by the Petitioner. At the initial hearing on the petition for post-conviction relief, the parties agreed that the first amended petition would not be considered by the post-conviction court.

[2] The second amended petition removed all allegations concerning mitigation and the penalty phase of the original trial, which had been included in the first amended petition and were the cause of Petitioner's refusal to sign or verify the first amended petition.

[3] The post-conviction court's findings of facts and conclusions of law indicate that a third amended petition was filed at the hearing on November 24, 2014. The transcript, however, does not reflect any discussion of an amendment being filed on that date. The appellate record does not contain a "third" amended post-conviction petition. At the hearing, the trial court afforded post-conviction counsel ten days within which to file an amendment to the petition. On December 8, 2017, the Petitioner filed a "fourth" amended petition. Although titled "fourth," the Petitioner requests that the court grant "the Third Amended Post-Conviction Petition." Even if this court were to assume that a "third" amended petition was filed but not included in the appellate record, the record before the court contains sufficient pleading of each allegation presented at the post-conviction hearing and raised on appeal.

trial counsel's presentation of evidence concerning the Petitioner's alibi; trial counsel's presentation of evidence concerning the handling and presentation of evidence gathered at the crime scene; trial counsel's failure to adequately prepare the Petitioner to testify at trial; trial counsel's failure to challenge prosecutorial misconduct; and trial counsel's failure to present evidence concerning an alleged improper relationship between the trial judge and a victim-witness coordinator employed by the Hamilton County District Attorney General's Office. After a series of evidentiary hearings, the post-conviction court denied relief. The Petitioner filed a timely notice of appeal.

The Petitioner specifically directed post-conviction counsel not to raise any allegations concerning mitigating circumstances or the sentencing phase of the trial. To this end, the Petitioner refused to certify the first amended petition because the petition contained allegations concerning mitigating circumstances, and he specified in the second amended petition that he did not approve or desire that any mitigation issues be presented in the post-conviction litigation. A competency evaluation determined the Petitioner to be competent to waive the presentation of mitigation issues at the post-conviction proceedings. The post-conviction court also engaged the Petitioner in a colloquy concerning his desire to forgo any post-conviction challenges to the presentation of mitigation evidence or the sentencing phase of the trial.

### Factual Background

The following is a summary of the evidence presented at the Petitioner's 2003 trial:

> The State's proof showed that, in November 2000, Uncle Charlie's Produce, a fruit stand owned by Charles Sims on Brainerd Road about a mile from [Mike] Chattin's house, burned down under suspicious circumstances. Several weeks before Bond's murder, Defendant and his friends Mike Chattin and Carl Hankins stopped by Sims' rebuilt fruit stand. Defendant remained in Chattin's truck while Chattin and Hankins spoke with Sims, who told them he suspected that a competitor, the owner of Nunley's fruit stand across the street, had burned down his old stand. When Chattin and Hankins returned to the truck and informed Defendant of Sims' suspicions, Defendant remarked, "we ort [sic] to go up there and kick his [Nunley's] produce around a little bit and turn his tables over and maybe drag him up and down the road." Later that day, Defendant suggested burning Nunley's fruit stand because Defendant thought "an eye for an eye" should apply. According to the State's theory, this encounter caused Defendant to begin planning the arson of the fruit stand.

Defendant had lived with Chattin at Chattin's house on Brainerd Road in Chattanooga until he moved to his girlfriend's house on Gann Road in Hamilton County about six weeks before Bond's murder. On the afternoon of September 5, 2001, after receiving a telephone call from Chattin, Defendant left his girlfriend's house with his MAK-90 semiautomatic assault rifle and a backpack. That evening Defendant, Hankins, and Murphy Cantrelle, another of Chattin's friends, were at Chattin's house. Cantrelle and Hankins left at about 10 to 11 p.m., near the time that Chattin and his girlfriend, Carol Bishop, arrived. Before Hankins departed, Defendant told him that it was time for him to leave, "that there was either things going on or things [Hankins] didn't need to be a part of, that it would be better off if [Hankins] just left." When Chattin and Bishop went to bed around 11:30 p.m., Defendant was still at Chattin's house.

Around 1:30 a.m. on September 6, 2001, Nola Rannigan, who lived in the house next to Nunley's produce stand, noticed a car in the parking lot with its lights on. She later heard "a big bam and then . . . several bams after that and then a couple pops." Rannigan looked out the window and saw that the car was still there. About five or seven minutes later she saw a truck with its lights off pull out of the parking lot and slowly proceed west on Brainerd Road. Rannigan saw only one person, the driver, in the truck. When the driver straightened himself up, she could tell that he was "a fairly big man, at least six f[ee]t."

That same morning Deputy Bond was patrolling the East Brainerd Road area in his marked patrol car. When he did not respond to calls from the dispatcher, officers began looking for him. At about 2:30 a.m., Officer Kevin Floyd of the Hamilton County Sheriff's Office found Deputy Bond's body lying in the parking lot at Nunley's fruit stand. Deputy Bond had suffered multiple severe gunshot wounds, seven inflicted with a high-powered large caliber weapon. Two other wounds were consistent with a .40 caliber Glock pistol. The wounds were spread over the victim's body from his mouth and neck to his arms, abdomen, thigh, and knee. The gunshot wound in the victim's mouth occurred while the victim's mouth was partially open, rupturing the victim's lips, and exited the base of the victim's skull. Bond's shirt was open, and the front part of his bulletproof vest and his .40 caliber Glock service weapon were missing. There was no blood on the front of Deputy Bond's shirt in the area where his bulletproof vest would have been, but blood was present on the back panel of the vest. Bond's patrol car was still on the lot, running and with its lights on. Another vehicle, a black Ford truck, was also parked at Nunley's.

Investigating officers noticed the odor of kerosene or gasoline around the produce stand and a greasy film on the Ford's windshield, its hood, the truck's passenger side, and the nearby ground. Analysis of a soil sample taken from underneath the passenger door of the truck revealed the presence of gasoline. Prints from a size 13 shoe were discovered behind the truck. Investigators also found shell casings, cartridge casings, and bullets on the ground at the fruit stand.

Around 4 a.m. Mike Chattin approached a Chattanooga police officer at a convenience store and told him, "My buddy just killed a policeman." Chattin was "extremely upset, shaking all over, [and] trembling." Based on Chattin's information about Defendant, a SWAT team was sent to Chattin's house around 5 o'clock that morning. SWAT team members took positions from which they could observe the back of the house. At least three team members saw Defendant walk out of the house onto the deck and drop several objects off of the deck. About ten or twenty minutes later Defendant came out of the basement and approached his car, where SWAT team members apprehended him. When the officers attempted to handcuff him, Defendant tried to grab an officer's gun, and a fight broke out between Defendant and SWAT team members. Defendant was eventually subdued and taken to the hospital for treatment of injuries suffered during his arrest.

A search of the area below the deck, where the SWAT team members had seen Defendant throw the objects, yielded the front half of Deputy Bond's bulletproof vest and his .40 caliber Glock pistol as well as black sweat pants, a black hooded sweatshirt with a camouflage cape attached by fishing line, a black T-shirt, and a size 13 boot. Inside the open doorway to the basement, officers found Defendant's MAK-90 rifle with two magazines. The gun was ready to fire. In the basement the officers also recovered a backpack and other items, including a cellphone. In the backpack they found a spool of fishing line, another magazine of ammunition, and boxes of Wolf ammunition. A bullet hole was discovered on the passenger's side of Chattin's Dodge truck, which was parked at the house. A substance appearing to be blood was observed on the exterior passenger side, the windshield, and the hood of the vehicle.

Forensic testing revealed that nine of the shell casings found at Nunley's stand and bullet fragments recovered from the victim's body had been fired from Defendant's gun. Other casings found at Nunley's produce stand had come from the victim's gun. Gunshot residue was found on

Defendant's hands in an amount sufficient to conclude that he had shot a gun. Particles on the sweat pants and sweatshirt found near the deck were consistent with gunshot primer residue. The partial shoe tracks near the Ford truck at the scene were consistent in size, shape and tread design with the sole of the left boot discovered under the deck. Microscopic examination of fibers obtained by vacuuming the victim's patrol car and fibers from the burlap sewn onto the sweatshirt showed that the two were consistent with one another. Fibers microscopically similar to fibers from the sweat pants and T-shirt were found on the interior driver's side of the victim's car. Hairs on the T-shirt, sweat pants and sweatshirt were microscopically similar to Defendant's hair; and Defendant's DNA was found in the waist band of the sweat pants. Gasoline was also present on the clothing. DNA testing established that the blood on Chattin's truck belonged to the victim, Donald Bond.

Mike Chattin testified that Defendant knocked on the door of the bedroom where Chattin and Carol Bishop were sleeping at about 2:30 a.m. and asked to speak with Chattin privately. Chattin followed Defendant to a second bedroom, where Defendant told him that he had borrowed Chattin's Dodge Ram truck and pointed to the bed where Deputy Bond's service weapon, the front of Bond's bulletproof vest, and Defendant's assault rifle were lying. Defendant then announced that he had killed a policeman. Defendant said that he regretted leaving shell casings and not getting an entire bulletproof vest but that the killing had provided him "stress relief." He told Chattin that he had killed fifteen to seventeen other people, two or three of whom were policemen. When the two men heard an ambulance pass by, Defendant chuckled and said, "[i]t ain't going to do them no good, they're too late." Defendant told Chattin he had gone to Nunley's to burn it. When he saw Deputy Bond pull into the parking lot, he crouched behind the truck. When Bond approached, he came out from behind the truck and shot Bond. Defendant told Chattin that he picked up Bond and tried to pull off the vest, which came apart and caused Bond's head to hit the ground. According to Chattin, Defendant had "liked it so much that [he] picked him up and did it again." Defendant offered to give Deputy Bond's gun to Chattin and expressed the need to "get rid of that stuff" but refused Chattin's offer to help him do so.

After going outside to talk with Chattin's neighbor, Pam Treadway, about the police cars rushing to Nunley's produce stand, Defendant asked Chattin to take him back to the crime scene. Chattin refused. Defendant related to Chattin that when Chattin's truck had not started after he shot

Bond, he tried to drive away in Bond's patrol car but could not get it into gear.  Finally, he started Chattin's truck and drove away.  Defendant presented Chattin some tomatoes he had brought from Nunley's as a "present."  Defendant said that he would need food and protection and that Charlie Sims should know about what had happened.  Chattin explained that Defendant was not excited while telling him about the murder but "was very calm, [and] showed great pleasure."

After hearing Defendant's story, Chattin returned to his bedroom, woke up Bishop, and told her what Defendant had told him.  Implementing a plan the two worked out to elude Defendant and escape the house, Chattin told Defendant that he was leaving in his own car to eat breakfast with Bishop who left first in her car around 3:30 a.m. and headed to her own home.  Chattin stopped to get gasoline, unsuccessfully tried to contact a friend of his who was a policeman, and stopped again for gas.  After checking to see that Bishop was safely at home and trying once again to reach his friend, Chattin called 911, then waited at the convenience store where he encountered the police officer at 4 a.m.  Chattin testified that he did not kill Deputy Bond.

The parties stipulated that Defendant had filed a civil rights lawsuit in federal district court in Chattanooga in 1999 seeking monetary damages from three Chattanooga police officers and the City of Chattanooga.  This case was set for trial in mid-September 2001.  The State presented proof that Malcolm Headley, a friend of Defendant, sold Defendant the MAK-90 assault rifle used to kill the victim.  Defendant also asked Headley to sell him a bulletproof vest.  Headley refused but told Defendant where he could purchase one.  Defendant told Headley that he had had "trouble with some law officers" and "had a lawyer working on it."  Defendant said that he was "going to take care of this problem."  When Headley asked if Defendant was going to court, Defendant replied, "Well, yeah, and if I could kill somebody, I will, even if I have to sneak up on them and do it."  When Headley gave Defendant a "funny" look, Defendant said that he was joking.  Carl Hankins testified that Defendant told him when they were talking about the police that Defendant "very much disliked the police department."  Defendant also told Hankins that if a police officer tried to take him into custody, Defendant "would kill a man before he would ever take a beating like he took before."

The defense theory at trial was that Chattin was the real killer and had framed Defendant.  The proof showed that Chattin owned several guns

and that ammunition of the type used in the MAK-90 was found in his house. Chattin also was involved in buying drugs and using methamphetamine. After the murder he had warned persons to whom he had given or sold guns not to let the police know where the weapons had come from. Chattin's wife, Tina Hunt, left him in the spring of 2001 because of physical abuse and his drug use. Sheriff's officers thereafter served a restraining order on Chattin and left a warning at his house when he violated the order by stalking his wife at her work. The defense presented testimony that Chattin thought his wife was dating a policeman and that the police were harassing him. The wife of one of Chattin's drug dealer friends testified that the weekend before September 6, Chattin told her that he wanted to kill somebody or burn something. The defense presented inconsistencies in Chattin's accounts of the circumstances surrounding Defendant's telling him about the killing and Chattin's "escape" from the house afterward. Another of Chattin's acquaintances testified that Defendant had answered the telephone at 1:30 a.m. on the night of the murder when the witness called Chattin's house.

Pam Treadway, Chattin's neighbor, testified that in May 2001, Chattin had asked her to lie to a sheriff's officer who had come to his house looking for him and tell the officer that he was not at home. Later that night Chattin came to Treadway's house, laid some papers and a .9 mm gun on her coffee table, and told her not to touch the gun, that he was going to "kill him a cop." Chattin left the gun with Treadway. Treadway also testified that on the night of the killing she looked through her window and saw Defendant sleeping on the couch in Chattin's living room. Treadway said that she saw Chattin and Bishop leave Chattin's house around midnight September 6 and come back at 12:30 a.m. Chattin then followed Bishop in his car as she drove away in her car. Around 1:30 a.m. she saw Cantrelle leave in Chattin's truck. About 2 a.m. Treadway observed Cantrelle packing garbage bags and "stuff" behind the seat of a Chevette and then drive away. Later that night, as she and Defendant were watching police cars respond to the murder, Defendant, who was dressed in shorts and a top, acted like someone who had just woken up. After the murder, Treadway said, Chattin told her to keep her mouth shut or he would shut it for her; he also threatened to set fire to her house and unscrewed the bulbs out of her security lights.

The defense also presented the testimony of Dr. Marilyn Miller, a professor of forensic science and crime scene investigation. Dr. Miller testified in detail about the shortcomings in the criminal investigation of

this case, including inadequate security at the crime scene; the failure to test for fingerprints on the hood of Chattin's truck; and the "meaningless" gunshot residue tests. Dr. Miller also testified that chemical examination of the fibers found in the victim's patrol car disclosed that they had not come from the same source as the burlap fabric sown on the sweatshirt found beneath the deck at Chattin's house.

To raise doubt about Defendant's willingness to commit a murder on the night of September 5th, the defense called the attorney representing Defendant in his federal lawsuit to testify that he and Defendant had an appointment scheduled for 8:30 a.m. on September 6 to discuss a possible settlement of the case. On cross-examination of the attorney, the State introduced Defendant's July 2001 answer to an interrogatory in the case, in which he stated that he had "grown to despise the police" and felt that they were "crooked."

This ended the proof in the guilt/innocence phase of the trial. Following deliberations, the jury returned its verdicts, convicting Defendant of first degree premeditated murder, first degree felony murder committed during the perpetration of arson, and first degree felony murder committed during the perpetration of theft.

State v. Kiser, 284 S.W.3d 227, 234-39 (Tenn. 2009) (footnotes omitted). At sentencing, the Petitioner waived the presentation of any mitigation evidence. Following a jury-out colloquy, "in the presence of the jury, the defense stated that it would present no further evidence." Id. at 241. The State relied upon the evidence presented during the guilt-innocence phase to establish the single aggravating circumstance.

On direct appeal, relative to the guilt-innocence phase of the trial, the Petitioner alleged that he was denied a fair and impartial jury by the State's exercise of peremptory challenges and by the trial court's refusal to excuse for cause two jurors, that the trial court erroneously denied a pretrial hearing to determine the admissibility of the State's proposed expert testimony, that the evidence was insufficient to support his convictions for first degree murder, that the trial court erroneously admitted the Petitioner's statements to others expressing his hostility toward the police, that the trial court erroneously limited testimony that would have established Chattin's motive to frame the Petitioner (to wit: the Petitioner had an affair with Chattin's wife, Tina) and shown Chattin's animosity toward the police, that the trial court erroneously excluded evidence of an anonymous telephone call to Ardena Garth implicating Chattin and Cantrelle in Deputy Bond's murder, that the trial court erroneously instructed the jury concerning

reasonable doubt, and that the trial court committed reversible error in failing to instruct the jury concerning residual doubt.

## Post-Conviction Hearing Testimony

Mack Donald Heard testified at the post-conviction hearing that he was "assigned to a federal joint drug task force" operating in Chattanooga from 1988 through 2003. He testified that, although he was not on payroll with any law enforcement agency, he received payment for "chasing drug dealers" by locating dealers and performing undercover work that resulted in the arrest and prosecution of several drug dealers in the Chattanooga area. He claimed that he had worked with the drug task force for money, not because he had been arrested on any drug charges. Heard testified that he reported to Tennessee Bureau of Investigation Agent Joe Copeland and that Agent Copeland took part in the surveillance and sting activities in which Heard was involved. Heard stated that he always wore a wire and recording device when participating in actual and potential drug transactions. He also stated that he delivered recordings to Agent Copeland throughout his association with the drug task force.

In addition to his work with the drug task force, Heard testified that he operated a used car business. Heard said that he first met Mike Chattin sometime from 1994 to 1996 when he purchased a used pick-up truck from Chattin. He acknowledged that he used his interest in purchasing the truck as a means to establish rapport with Chattin in hopes of selling drugs to Chattin in furtherance of his work with the drug task force. Heard said that Chattin never "trusted" him enough to buy drugs from him.

After Deputy Bond's death, Heard continued to approach Chattin in an effort to engage Chattin in drug transactions. Heard recounted multiple times that Chattin admitted his complicity in the victim's death. Heard testified that during one conversation, Chattin pointed a .9 millimeter handgun at Heard and threatened to "gut [him] like he did the cop if [he] was there to set him up." Heard claimed that Chattin admitted that he stripped off his clothes after shooting Deputy Bond and put the clothing in "that guy's room" – a reference that Heard understood was to the Petitioner. Heard also testified that Chattin told Heard that he and Carol Bishop rode around for a few minutes to "get their story straight" before flagging down a police officer to "play" the shooting on the Petitioner. He recalled Chattin's telling him that he took the victim's vest and gun and left them at his house.

Heard testified that he did not record all of his conversations with Chattin and that, of the ones recorded, he did not turn all of the recordings over to the drug task force. He recalled "time and time again" telling the drug task force investigators about Chattin's admissions while the Petitioner's case was pending trial. He said that not only was

Chattin not investigated for the victim's death, but Chattin was never charged with any drug-related crimes despite participating in at least two drug transactions with Heard. Heard recalled that Agent Copeland told him "not to worry about" Chattin. Heard said that after 10 years had elapsed he decided no one was interested in the tape recordings so he burned them.

Heard testified that while the Petitioner's trial was pending, he contacted District Public Defender Ardena Garth. Although he did not identify himself, he told Garth that Chattin had confessed to killing Deputy Bond. He also told Garth that he had tape recordings of Chattin's admissions. He told Garth that he would contact her again before trial, but he never did. Heard also claimed that he told District Attorney General Bill Cox about Chattin's admissions. Heard felt like the District Attorney General "just kind of blew [him] off" about his report that Chattin was the perpetrator. Heard testified that two weeks after his discussion with the District Attorney General, he was arrested for theft of an automobile and "asked to leave" Tennessee. He said that he left Tennessee so that the charge would be dismissed and that when he returned eight years later, he assumed that the Petitioner had already been executed.

On cross-examination, Heard admitted that he had a prior conviction for felony theft involving stolen hubcaps. He said that he worked twelve to fourteen years as a confidential informant but was now "inactive" after "some cops tried to get [him] murdered." He reiterated that no one to whom he spoke about Chattin seemed interested in investigating Chattin for Deputy Bond's death. When confronted with notes indicating that he spoke to the District Attorney after, rather than before, his arrest for theft, he acknowledged the accuracy of the notes but said that he "believed" that his conference occurred before his arrest. He stated that he destroyed his copies of the recordings because he was no longer working as a confidential informant. He also said that he had no idea what had happened to the tapes he had given investigators.

Rick Nunley testified that he was the owner of the fruit stand where Deputy Bond was killed. On the day before Deputy Bond's death, Nunley had spilled some gasoline while working on a leaf blower. Two days after the shooting, when Nunley returned to open the fruit stand, he could still smell gasoline where he had spilled it days before. He testified that he had stored lighter fluid inside the building and had spilled a small amount. He said that upon his return to open the fruit stand two days after the shooting, everything appeared as it had before the shooting. He stated that he also explained to investigators that he had spilled gasoline and had been burning leaves on the day before the shooting. Nunley also testified that he told investigators that he wore size twelve or thirteen boots.

Demple Walker testified that at the time of Deputy Bond's death, she worked at the Kangaroo Market on Shallowford Road with Carol Bishop, who was Chattin's girlfriend. She knew the Petitioner as someone who had come into the store "a couple of times," and she had visited Chattin's home. Walker recalled that on the night of the shooting, Bishop telephoned her several times to check on the store and "sounded different . . . like she was scared and she didn't want to talk." She said that as soon as Bishop showed up to work, Bishop announced, "Mike [Chattin] shot a cop."

On cross-examination, Walker testified that she asked Bishop why Chattin would shoot a police officer but never received an answer. She acknowledged that she did not call the police. She claimed that she told the Petitioner's counsel and the District Attorney General that Bishop told her that Chattin had killed Deputy Bond, but she noted that much of her testimony at trial concerned Bishop's reluctance to answer questions about Chattin's possible involvement in Deputy Bond's death. Regarding her testimony that Bishop told her that Chattin had "killed a cop," Walker explained that she "remember[ed] now . . . but not back then" and that "the more [she] th[ought] about it, the more [she] realized what [Bishop] said."

Pam Treadway testified that she was Chattin's neighbor at the time of Deputy Bond's death. She said that she had met the Petitioner "one or two times." She said that she stayed away from Chattin because he was involved in a lot of drug activity. She testified that her husband became addicted to methamphetamine provided by Chattin. She knew that the Petitioner and "a guy named Murphy" were living with Chattin at the time of Deputy Bond's death. She had heard Chattin threaten his wife, but she had never met Chattin's wife. Treadway testified that Chattin brought a .9 millimeter handgun to her home and asked to leave it there. She stated that she refused Chattin's request. She recalled him telling her that his wife was seeing a police officer and that he was going to shoot the police officer. On the night before Deputy Bond's death, Treadway recalled seeing Chattin talking to someone about buying a Corvette and that Chattin's girlfriend was at the home also. She recalled first seeing the Petitioner when they both came outside at approximately 1:30 in the morning to the sound of sirens. She said that the Petitioner fell back to sleep on the living room couch, but she later saw Chattin and Murphy Cantrelle moving plastic bags to a car before Chattin and his girlfriend left the house. Treadway recalled the police coming to her door later that morning and telling her to stay inside because the Petitioner had killed an officer. She claimed that she tried to tell them that the Petitioner had been home all night but the officers told her "not to be talking to nobody." Treadway claimed that she telephoned the Petitioner's attorneys to tell them that she saw Chattin handing stuff off the porch to Cantrelle on the night of the shooting. Treadway said that Chattin later threatened to "burn [her] up in her house" if she talked to the police.

- 12 -

Nola Rannigan testified that she lived behind Nunley's Fruit Stand at the time of Deputy Bond's death. She recalled seeing a truck a leaving the scene after she heard gun shots. Rannigan said that she saw the driver and described him as having "very short hair."

David Michael Tucker testified that he knew Chattin and was familiar with the Dodge Ram pick-up truck that Chattin regularly drove. He recalled driving by Nunley's Fruit Stand at approximately 1:15 a.m. on the night that Deputy Bond was killed. He saw a familiar truck that he believed to be Chattin's Dodge Ram pick-up. He said that "something told [him] to go on" and not stop at the fruit stand. He said that he had known Chattin ten years or more and that "every once in a while," Chattin could have a temper. He stated that some time after Bond's death, Chattin told him that he had cancer.

On cross-examination, Tucker testified that he met the Petitioner at Chattin's house once. He said that he was out late on the night of the shooting having worked second shift. At the time, he told investigators that he had seen a maroon truck at the scene. He also could not see anyone in the truck. Tucker said that he talked to Chattin a few days later but he never talked to the Petitioner. He also never saw the truck again.

Michael Anderson testified that he had been an attorney practicing in Chattanooga since 1987. At the time of Deputy Bond's death, Anderson represented the Petitioner in a civil rights lawsuit filed against three Chattanooga City Police Department officers who had allegedly beaten the Petitioner. Anderson recalled testifying at the Petitioner's trial. Consistent with his trial testimony, he stated that he and the Petitioner had a meeting scheduled to discuss a settlement on the day that the Petitioner was arrested for the shooting. He recalled that the lawsuit had survived summary judgment and that both he and the Petitioner were anticipating a favorable settlement offer. Anderson described the Petitioner's deposition behavior as tense but appropriate and polite. He said that the Petitioner was afraid of the police.

On cross-examination, Anderson stated that the lawsuit was voluntarily dismissed following the Petitioner's arrest. He admitted that the Petitioner disliked the police but reiterated that his dislike was the result of his fear and mistrust.

Kimberly Ann Bowman testified that she had testified untruthfully at the Petitioner's trial. She said that Chattin and Greg Drake threatened to kill her children and herself if she repeated Chattin's admission to killing Deputy Bond. Bowman said that she knew Chattin and his wife, Tina, through their mutual use of methamphetamine. She testified that she informed Chattin that Tina was having an affair with a police officer and warned him to be careful. Soon after Deputy Bond's death, she said that Chattin admitted to shooting "that mother f***ing police officer." She acknowledged that she

was on supervised release for a federal drug conspiracy conviction and addicted to methamphetamine when she testified at the Petitioner's trial. She also said that she was very scared when she testified at trial. She stated that the Petitioner was innocent of Deputy Bond's murder.

On cross-examination, Bowman admitted that she used methamphetamine five to six times daily for approximately two years. She described that she became paranoid and turned against her family during that time. She said that she was released from federal custody in 2012 and that she received addiction treatment while in prison. She acknowledged, however, that her drug addiction and a stroke had affected her memory.

Cynthia Collins testified that she was married to Jonathan Samuel Collins, who was a deputy with the Hamilton County Sheriff's Office at the time of Deputy Bond's death on September 6, 2001. She said that her husband had known Chattin since 1996 and that the two men shared an interest in rebuilding old cars. She recalled that on the night of Deputy Bond's death, Chattin telephoned their home three or four times trying to find her husband. She described Chattin as frantic. She did not discuss with Chattin the purpose of his call and only told him that her husband was out with friends.

Jonathan Samuel Collins testified that he met Chattin sometime in 1995 after his discharge from the Marine Corps while he was working for the Hamilton County Sheriff's Office. He said that they developed a sporadic friendship around rebuilding his truck. He said that he visited Chattin about once a month and had met the Petitioner at Chattin's garage. He said that he met Chattin's wife, Tina, and was aware of the couple's marital problems surrounding Tina's affair with a younger police officer. Collins denied knowledge of Chattin's drug use and dealing. He recalled Deputy Bond's death and said that they sometimes worked second shift together. Collins said that he did not recall speaking to Chattin on the night of the shooting but did recall his wife's telling him that Chattin had called several times. He never discussed his patrol or drug unit work with Chattin and never suspected Chattin of buying or selling drugs. He also said that Chattin never made any comments to him that led him to believe Chattin had killed Deputy Bond. He never returned Chattin's telephone call because shortly after getting home that night, his lieutenant telephoned him to tell him of Deputy Bond's death. He resigned from the Sheriff's Office in 2004 after getting "caught up in a federal money-laundering investigation." He built a monument to Deputy Bond.

Reagan O. McDevitt worked with the Hamilton County Sheriff's Office in 2001 and kept the crime scene log at the scene of the shooting. He described the log's purpose as to document who came to the scene and when they left the scene. He said that someone might not necessarily sign out if he or she were returning soon.

Cindy Richardson testified that she has been married to attorney Michael Richardson for twenty-four years. She said that in June 2001 she was hired as a victim-witness coordinator with the Hamilton County District Attorney General's Office. She was assigned to Division III, which was the same trial court where the Petitioner's trial occurred. She identified a "form letter" with her signature regarding the Petitioner's case, but she denied ever working on the case. She also stated that she did not discuss any of the cases with the trial judge, who has since died. She said that she considered the trial judge a friend and that she "liked him a lot" but also denied that there was any sexual relationship between herself and the trial judge. She also denied having any influence over the trial judge.

Richardson recalled attending the District Attorney General's Conference in Memphis in October 2003. She denied bragging about her friendship with the trial judge or influence she may have had over him. She did, however, admit to there being "a lot of alcohol" at the conference. She said that upon her return from the conference, District Attorney General Bill Cox and then-Assistant District Attorney General Barry Steelman called her for a meeting and asked her to resign. She resigned on October 29, 2003. Richardson denied telling any dinner companions that she was having an affair with the trial judge. She did say, however, that she repeatedly asked to be moved from his courtroom because it was "toxic," but her requests were ignored by General Steelman. She said that she was glad to leave. She stated that her relationship with the trial judge was only friendship and that "[h]e liked to talk about religion and how toxic this place [the courthouse] is." She denied the occurrence of any sexual harassment, advances, or improper relationship.

Michael Richardson testified that his wife never told him that she had influence over the trial judge who presided over the Petitioner's trial. He said that his wife never made any derogatory remarks about the trial judge. He apologized for the use of terms such as "infatuation" and "sexual harassment" in a letter to the Petitioner's counsel concerning the post-conviction allegations and clarified by stating those were his terms, not his wife's terms, used to characterize the circumstances. He said that the allegations in the post-conviction petition were "patently false."

Mary Ann Green testified that she was employed as an Assistant Public Defender from 1991 until 2014. She represented the Petitioner at trial, along with Karla Gothard, another attorney in the office. She recalled, four to six weeks before trial, attending a meeting initiated by District Attorney General Cox to discuss Cindy Richardson's alleged statements made at the conference. Gothard, Garth, and General Steelman were also in attendance. Green recalled that there was an "implication" that the trial judge and Richardson were having an affair and "that [Richardson] could get him to do anything she wanted him to do." The purpose of the meeting was to inform the Petitioner's

counsel that the matter had been addressed and that Richardson had resigned. Green testified that she did not discuss the matter with the Petitioner because, at that time, Green was busy working on mitigation and the Petitioner had become uncooperative. She did not know if Gothard or Garth had discussed the matter with the Petitioner. As for counsel's deciding not to file a motion to recuse the trial judge, Green testified that everyone held the trial judge "in very high regard" and that she "did not believe that anyone would have sway over" him.

Judge Barry Steelman testified that he was the Assistant District Attorney General who prosecuted the Petitioner at trial. When the issue arose concerning Richardson's alleged relationship and statements about the trial judge, Judge Steelman and District Attorney General Cox thought it best to inform the Petitioner's counsel. Judge Steelman was not involved in discussions concerning Richardson's resignation. He denied that Richardson ever asked to be transferred from Division III. He also said that he had no personal knowledge of any sexual relationship between Richardson and the trial judge.

Chattanooga Attorney Hank Hill testified that he and his wife were social friends of the Richardsons. He recalled one occasion while out to dinner with the Richardsons during which Ms. Richardson indicated that she was involved in a secret, sexual relationship with the trial judge and that the trial judge had become jealous of her interactions in court with then-Assistant District Attorney General Steelman. Hill believed that, based upon Richardson's statements, the relationship with the former trial judge was more about sex and did not involve discussing the cases in the judge's court.

Hamilton County Sheriff's Office Detective Jeff Baker recalled Richardson's presence at a criminal investigation division meeting soon after the shooting. He also recalled interviewing a witness, who worked at the Kangaroo Market who, and in a relationship with Chattin.

Chattanooga Police Department Investigator Darrell Whitfield assisted in processing evidence collected at the primary crime scene, as well as processing evidence collected from Chattin's residence and the vehicles. He testified that the standard protocol was followed to secure and preserve the integrity of the crime scene before collecting any evidence. He recalled that Chattin's truck was towed to the county bay for further examination and processing. He recalled that he "pushed" the truck in order to obtain tire prints and that the "tire printing" was performed before the truck had been fully processed for fingerprint and bloodstain evidence.

Lieutenant Robert Starnes with the Hamilton County Sheriff's Office testified that he assisted with the crime scene investigation. He said that Chattin was always considered a witness – never a suspect. He recalled Jonathan Collins' telling him that

Chattin had tried to contact him the night of the shooting. Lieutenant Starnes recalled that, during an interview, Chattin appeared nervous but not under the influence of any drugs. He was not aware of any criminal investigations involving Chattin.

Debra Slate testified in an offer of proof that she was a juror at the Petitioner's trial. She stated that had Heard, Nunley, and the Petitioner testified at trial, she would not have convicted him based upon the reasonable doubt that their testimonies raised.

Lisa Gray testified that she knew Chattin and dated him until his death. She said she once accused him of killing Deputy Bond and that he never admitted nor denied doing so. She said that she did not take drugs but that Chattin took every illicit drug available.

Following a colloquy, the Petitioner waived presentation of any evidence or allegations concerning mitigation or the penalty phase of the trial. The Petitioner testified that he was represented at trial by Mary Ann Green, Karla Gothard, and Howell Clements but that he primarily interacted with Gothard. He said that he insisted on going to trial because he was innocent but that his attorneys wanted him to plead guilty. He claimed that he "ended up basically kicking Mary Ann Green off the case" because she was involved in the investigation and presentation of mitigating evidence. He said that he wanted to testify at trial but that counsel never discussed his testimony or prepared him to testify. The Petitioner acknowledged that he told the trial court, during the Momon colloquy, that he did not want to testify. He claimed, however, that he only decided not to testify because counsel had failed to prepare him for testifying.

The Petitioner testified that he first met Chattin when he was seventeen years old. About ten to twelve years later, he became reacquainted with Chattin and moved in with him in June 2001. Approximately three weeks before Deputy Bond's death, the Petitioner met Charlie Sims while out with Chattin. Sims owned a competing fruit stand and accused Nunley of burning down his stand in 2000. The Petitioner did not know Nunley. The Petitioner recalled that Chattin did not like hearing what Nunley had done and wanted to "kick up [Nunley's] stuff and drag him up and down the road behind his truck." The Petitioner testified that he told Chattin that was not a good idea. He denied ever threatening any retaliation toward Nunley.

The Petitioner testified that he was awaiting a settlement of the civil rights lawsuit while he lived with Chattin. He said that Chattin was selling marijuana and "anything he could get his hands on." The Petitioner said that Jonathan Collins was at Chattin's house regularly – about twenty out of thirty days - and that Collins was involved in the drug activities. The Petitioner said that Collins and Chattin were such "good friends" that

- 17 -

Collins once left his police cruiser outside Chattin's home overnight while he borrowed Chattin's Corvette.

The Petitioner said that Chattin's relationship with his wife was violent and hostile by the summer of 2001. He said that Chattin allowed Tina to have sex with another man because Chattin was impotent but that Chattin was outraged when he learned that Tina was involved with a police officer. The Petitioner said that Chattin tried to involve him in a bank robbery as well as in kidnapping Tina during the summer of 2001.

The Petitioner testified that he owned a .9 millimeter handgun that he had purchased in preparation for "Y2K." He also said that he gave Chattin a rifle as collateral for rent. He recalled that Chattin owned six rifles, a pistol, and a large amount of ammunition. By early fall, the Petitioner had moved in with his girlfriend, Beverly Mullins.

On September 5, 2001, Chattin telephoned the Petitioner and asked him to come over because he was depressed. After drinking beer with Chattin, the Petitioner decided to stay at Chattin's house that night. The Petitioner said that several friends left by 10:30 that night and that Bishop arrived around 11:00 p.m. The Petitioner said that Chattin and Bishop went to bed at 11:30 and that he fell asleep at approximately midnight. The Petitioner said that he woke up at 1:30 a.m. to a telephone call from Danny Cox who was looking for Chattin. He told Cox to try Chattin's cellular telephone. The Petitioner dozed off until being awakened by sirens and police cars going down the street. He walked out on the front porch and spoke briefly to Pam Treadway. He went back inside to lay back down and soon saw Chattin arrive in his truck with Cantrelle in a separate vehicle. He said that the men moved two garbage bags from the truck to Cantrelle's car. The Petitioner saw Chattin remove the Petitioner's AK-47 rifle from the truck. Chattin told the Petitioner that all the police activity was due to a wreck on East Brainerd Road and asked the Petitioner to put away the rifle. Chattin then left in the Corvette to meet Bishop for breakfast. The Petitioner fell back asleep. He awoke to a call on his cellular telephone about a "standoff with police." Thinking it involved his boss, he gathered his belongings and left Chattin's home through the basement door. The Petitioner was accosted by the police. He testified that he thought it was a drug raid and fully complied with the arrest. He had no knowledge of Deputy Bond's death or the arson at the fruit stand. He also testified that the first time he learned of the allegations concerning the trial judge and Richardson was during the post-conviction hearing testimony. He said that had he known about it at trial, he would have sought the trial judge's recusal.

On cross-examination, the Petitioner admitted that he did not testify at his preliminary hearing. He said that he was frightened and did not give the police a statement. He said he would not have talked to the police without a lawyer present. He

- 18 -

told his attorneys that Chattin was the perpetrator. He claimed that Gothard did not investigate Chattin and the others as perpetrators. The Petitioner listed other individuals to whom Chattin had "possibly" confessed. The Petitioner claimed that everyone was afraid of Chattin and that the police and District Attorney General had "chased Mack Heard off" before his trial.

The Petitioner acknowledged that trial counsel adequately informed him of the charges and discussed procedure, discovery, and motions with him. He said that he and Gothard met weekly for up to an hour and a half each time. The Petitioner claimed that he directed counsel to subpoena certain witnesses for trial but that counsel failed to interview everyone he had suggested. When asked which witnesses were not interviewed, the Petitioner replied, "I don't know their names right off hand." The Petitioner said that counsel explained the motion for new trial to him. He complained, however, that appellate counsel was "sub-par." The Petitioner denied any knowledge of how the victim's bullet proof vest and service revolver ended up underneath the porch at Chattin's house. He could not explain how the bullets found in his bedroom matched those that were found at the scene. Likewise, the Petitioner could not explain how gunshot residue was found on his hands and on clothing containing his DNA. The Petitioner believed Deputy Bond was having an affair with Chattin's wife. He said that Chattin never confessed to him and that they did not communicate after the Petitioner's arrest.

At the close of proof, the parties stipulated that Roberta Lynn Pardue would have testified that she dated Chattin after Deputy Bond's death. She would have testified that Chattin was abusive to her and that he admitted to shooting a police officer when he and another individual went to burn down a fruit stand.

## ANALYSIS

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, we review the post-conviction court's application of the law to its factual findings de novo with no presumption of correctness. Id. at 457.

## Ineffective Assistance of Counsel

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In reviewing a trial counsel's conduct, we make every effort to "'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Felts v. State, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting Strickland, 466 U.S. at 689). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." Goad, 938 S.W.2d at 369 (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); Cooper v. State, 847 S.W.2d 521. 528 (Tenn. Crim. App. 1992)).

At the outset, the State argues that the Petitioner "made a global omission" by not eliciting evidence from trial counsel concerning strategic and tactical decisions relevant to the presentation and examination of witnesses at trial. In reply, the Petitioner, without citation to authority, argues that the burden of proof to establish trial counsel's strategy falls upon the State. While it is noteworthy that only one of the five attorneys who represented the Petitioner at trial and on appeal was called to testify at the post-conviction

hearing and that attorney testified only about the issue related to the trial judge's recusal, there is no requirement that trial counsel's strategy be proven. As already discussed, in the context of an ineffective assistance of counsel claim, the burden of proof is on the Petitioner to present clear and convincing factual evidence of deficient performance by counsel and prejudice arising from that deficiency. Testimony concerning strategy is generally helpful to a court's consideration of an ineffective assistance of counsel claim, but the absence of such testimony neither precludes nor establishes a claim of ineffective assistance of counsel. Neither party must prove strategy or tactics and the burden of proof for an ineffective assistance of counsel claim remains on the Petitioner.

*(i) Failure to Present Testimony that Chattin admitted to killing the victim:*

The Petitioner argues that his Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to present Mack Donald Heard as a witness at trial.[4] The State argues that Heard's testimony would have been cumulative to other testimony at trial concerning Chattin's violent and threatening behavior; statements that he wanted to kill the police officer with whom his wife, Tina, was involved; and admissions that he had killed Deputy Bond.

The post-conviction court ruled that the Petitioner failed to establish this allegation of ineffective assistance of counsel. Notably, the court found Heard's testimony lacked credibility based upon discrepancies between his testimony at the post-conviction hearing and Agent Copeland's testimony at trial concerning the degree to which Heard was instrumental in actual prosecutions of drug dealers and whether Heard had reported Chattin's alleged admissions to members of the drug task force. The post-conviction court also found that the Petitioner had failed to establish that counsel's performance was deficient. The court also noted that Heard's testimony, had it been presented, would have been cumulative to the testimony of other witnesses who testified that Chattin wanted to kill a police officer or had admitted to killing Deputy Bond. In making these determinations, the post-conviction court noted that the trial record reflected that counsel made "zealous" efforts to locate the anonymous caller, whom by the time of trial, counsel had determined was Heard. In response to the anonymous telephone call, counsel filed a

---

[4] The Petitioner also argues that "there has been a <u>Brady v. Maryland</u> violation as a result of the prosecutor's failure in this case to inform any defense team about the statements made by Mr. Chattin to Mr. Heard, and the prosecutor's failure to turn over tapes of the conversations of Mr. Chattin and Mr. Heard." The State does not address this argument in its brief. While not raising this allegation via <u>Brady</u> specifically, the Petitioner, in his pro se petition, alleged that the State failed to disclose favorable evidence regarding Chattin's alleged confessions, leniency toward Chattin, crime scene contamination, and bias by investigating officers who planted evidence. The post-conviction court found that the allegations were "speculative" and "unsupported" and that the Petitioner failed to meet his burden of proof as to these allegations.

motion to disqualify the District Attorney General's Office based upon allegations of favorable treatment received by Chattin surrounding drug task force investigations. Counsel for the Petitioner also sought a Rule 17(c) subpoena of documents and recordings surrounding Heard's interactions with Chattin, including any admissions Chattin made to Heard concerning Deputy Bond's death. The trial court denied the motion to disqualify but granted the subpoena. When the subpoena efforts proved unfruitful, the court issued a capias for Heard. When all efforts to locate Heard and bring him to testify at trial failed, counsel sought admission of the tape-recorded "anonymous" telephone call made to Garth. The trial court's exclusion of the tape-recorded telephone conversation was upheld on appeal. Kiser, 284 S.W.3d at 266.

The evidence does not preponderate against the post-conviction court's factual findings. Furthermore, the defense theory presented at trial was that Chattin was the actual perpetrator of Deputy Bond's murder. After an effort to admit the tape recording of Heard's telephone call, trial counsel called numerous witnesses who testified concerning Chattin's threatening behavior, his animus toward a police officer whom he suspected was in a relationship with his wife, and his statements that he was complicit in Deputy Bond's death. The State's proof at trial included forensic evidence placing the Petitioner in the victim's vehicle at the crime scene, in possession of items belonging to the victim, and in possession of the rifle used to commit the murder. The jury rejected the Petitioner's theory that Chattin was the perpetrator and that the Petitioner had been framed by the police. Therefore, we conclude that the Petitioner has failed to establish either deficiency or prejudice from the failure to call Heard as a witness at trial. The Petitioner is not entitled to relief as to this issue.

*(ii) Failure to present exonerating evidence concerning the crime scene :*

The Petitioner argues that trial counsel should have presented the testimony of Rick Nunley, the owner of Nunley's Fruit Stand, to testify that he had spilled gasoline while working on a leaf blower earlier on the day that Deputy Bond was killed. Nunley also would have testified that he had burned leaves and wore size "12 or 13" boots while on the property. Nunley provided his boots to law enforcement. Trial counsel failed to present this evidence that would have offered an explanation concerning the accelerants and boot prints.

The post-conviction court found that Nunley's testimony did not exclude the Petitioner's presence at the crime scene, noting that the clothing and a size 13 boot recovered at Chattin's home tested positive for accelerants. The record supports this finding. While Nunley's testimony may have been instructive as to why certain accelerants were detected at the crime scene, the proof at trial still established that the clothing found underneath Chattin's back porch contained both evidence of the

accelerants and the Petitioner's DNA. Likewise, the investigators discovered a size 13 boot underneath the back porch. The State presented testimony at trial that the boot was consistent in size and tread to a boot print found at the crime scene. The fact that Nunley wore a "size 12 or 13" boot does not rule out the Petitioner's presence at the crime scene and complicity in Deputy Bond's death. Therefore, the Petitioner cannot establish prejudice from trial counsel's failure to call Nunley as a witness at trial. Therefore, the Petitioner is not entitled to relief as to this issue.

*(iii) Failure to effectively elicit testimony that Chattin killed the victim:*

The Petitioner contends that trial counsel failed to elicit favorable testimony from certain witnesses who testified at trial. He contends that Walker would have testified that Bishop told her that Chattin had "shot that cop." He asserts that Treadway would have testified that Chattin told her that he suspected his wife was having an affair with a police officer and that he would shoot the police officer if he found him; that the Petitioner was asleep at Chattin's house when the shooting occurred; and that Chattin threatened her if she talked to the police. He asserts that Tucker would have testified that he saw a truck that he believed to be Chattin's at the fruit stand at approximately 1:15 on the morning of the shooting. Finally, the Petitioner contends that trial counsel failed to present "a detailed trial strategy" concerning his lack of motive for killing the victim because he was close to receiving a settlement in his civil lawsuit filed against the Chattanooga Police Department. The State contends that counsel were not deficient in their examination of these witnesses because their testimonies were redundant to other testimony presented at trial and did not exonerate the Petitioner. Therefore, the Petitioner cannot establish prejudice from trial counsel's failure to the elicit the testimony from these witnesses.

Walker testified at trial that she asked Bishop if the Petitioner had killed Deputy Bond and Bishop "said no." She also testified at trial that she asked Bishop if Chattin killed the victim and that Bishop said, "'I can't talk about it, I'm scared for my life.'" Walker testified that Bishop was scared of Chattin and would not talk about it anymore. The post-conviction court found that Walker's testimony at the post-conviction hearing was largely consistent with her testimony at trial and that the Petitioner had failed to establish either deficient performance or prejudice to support this claim of ineffective assistance of counsel.

Treadway testified at trial that on May 19, 2001, Chattin left a .9 millimeter gun on her table, told her that his wife was seeing a police officer, and also told her that he was going to shoot the officer. She testified that she recognized Deputy Bond as the officer who placed the order of protection "card" on Chattin's door on May 19, 2001, and that Chattin told her not to tell the police that he was at home when the notice was delivered. Relevant to the night of the shooting, she testified at trial that the Petitioner

- 23 -

was asleep on Chattin's couch, except at 2:30 a.m. when she and the Petitioner heard the police sirens and spoke outside from the porches. The post-conviction court treated Treadway's testimony at the post-conviction hearing with skepticism, noting the inconsistency from her post-conviction hearing testimony that she saw the Petitioner on Chattin's porch sometime around 1:30 a.m. when they both heard sirens. The proof at trial established, however, that Deputy Bond's body was not discovered until 2:30 a.m., so it is likely, as the post-conviction court commented, that Treadway's testimony at the post-conviction hearing was clouded by the passage of time.

Tucker did not testify at trial. At the post-conviction hearing, he testified that he drove by Nunley's fruit stand around 1:15 a.m. on September 6, 2001, and noticed a Dodge Ram pickup truck that he believed to be Chattin's. He could not identify anything about the driver. Tucker's testimony is cumulative to other evidence presented at trial. The Petitioner failed to establish either deficiency or prejudice from counsel's failure to present him as a witness.

Anderson testified at the post-conviction hearing consistently with his testimony at trial. At both times, he stated that the Petitioner had filed a civil rights lawsuit against the Chattanooga Police Department and that the case had survived a summary judgment motion. In an effort to establish that the Petitioner lacked any motive to kill Deputy Bond, Anderson testified at both the trial and the post-conviction hearing that he and the Petitioner had a meeting scheduled on the day of the shooting to discuss a settlement of the civil rights lawsuit. As a result of his arrest, the Petitioner dismissed the litigation. The Petitioner failed to establish that counsel committed ineffective assistance in their examination of Anderson at trial.

The record supports the post-conviction court's findings. The Petitioner failed to establish either deficient performance or prejudice. Therefore, he is not entitled to relief on this issue.

*(iv) Failure to present evidence that the physical description of the perpetrator was consistent with the description of Chattin:*

The Petitioner argues that trial counsel failed to present the testimony of Nola Mae Rannigan relative to her description of the perpetrator being consistent with that of Chattin. The State asserts that Rannigan's testimony concerning the appearance of the perpetrator was consistent with the Petitioner, who was 6 foot 4 inches tall, rather than Chattin, who was only 5 foot 6 inches tall. Therefore, the State contends, the Petitioner cannot prove ineffective assistance of counsel concerning Rannigan's testimony.

Rannigan testified at trial that she noticed a vehicle parked at Nunley's fruit stand around 1:15 in the morning on September 6, 2001. As she began getting ready for bed, she heard "a big bam and then there were several bams after that and then a couple pops." She looked out her window to see the vehicle was still there. She then saw a truck leaving the parking lot at Nunley's. She described the driver of the truck as "a fairly big man, at least six foot." She recalled that she heard the shots around 1:30 a.m. and saw the truck leaving about five minutes later. She awoke about an hour later to police cars at the fruit stand. Other evidence presented at trial established that the Petitioner had short hair. At the post-conviction hearing, Rannigan testified that the driver had short hair. Photographs exhibited at the post-conviction hearing show that, at the time of the shooting, both Chattin and Cantrelle had short hair.

The post-conviction court found that the Petitioner failed to establish either prong of ineffective assistance of counsel concerning this allegation. We agree that Rannigan's testimony at the post-conviction hearing was largely consistent to her testimony at trial, except for noting that the driver of the truck had short hair. That distinction, however, does nothing to exclude the Petitioner as the driver of the truck given that trial testimony established that the Petitioner also had short hair and, being six feet four inches tall, the Petitioner more closely matched Rannigan's description than Chattin, who was only five feet six inches tall. The Petitioner failed to establish either deficient performance or prejudice to support this allegation. He is not entitled to relief as to this issue.

*(v) Failure to present evidence challenging proper handling of the crime scene*:

The Petitioner argues that trial counsel failed to present testimony concerning the mishandling or lack of securing evidence at the crime scene. The State argues that the Petitioner failed to establish any tampering or contamination of the crime scene and, therefore, cannot establish any prejudice from trial counsel's failure to elicit testimony concerning the crime scene log.

Reagan O. McDevitt testified at the post-conviction hearing that he maintained the crime scene log as investigators entered, exited, and sometime re-entered the crime scene throughout the initial investigation. He testified that officers were allowed to exit and re-enter without making an entry in the log. The Petitioner argues, without presenting any evidence to establish contamination, that this procedure "allowed for contamination of the crime scene and perhaps improper tampering with the crime scene." The post-conviction court found that the Petitioner failed to establish that any contamination or tampering of the crime scene occurred. The evidence does not preponderate against this finding. Furthermore, counsel aggressively challenged the integrity of the crime scene at trial through the expert testimony of Dr. Marilyn Miller, and the jury rejected this

testimony.  The Petitioner failed to establish any deficient performance by counsel.  He is not entitled to relief as to this allegation
.

*(vi) Failure to adequately prepare the Petitioner to testify at trial:*

The Petitioner claims that he informed trial counsel on numerous occasions that he wanted to testify at trial but that he chose not to testify because counsel had failed to adequately prepare him.  He argues that had they adequately prepared him, he would have testified, asserting his innocence and Chattin's complicity in the shooting.  The State argues that the substance of the Petitioner's testimony – Chattin was the shooter, alibi, lack of motive – was presented at trial through other witnesses but rejected by the jury.  Therefore, the Petitioner cannot establish prejudice from any alleged failure of counsel to prepare him to testify.

The post-conviction court found that the Petitioner's testimony regarding his decision to testify at trial and counsel's preparation of him to testify lacked credibility because the full <u>Momon</u> colloquy at trial belies the Petitioner's post-conviction hearing testimony.  The record at trial reflects that counsel questioned the Petitioner concerning his decision of whether to testify and that the Petitioner said that he "elected not to."  He affirmed that counsel had fully discussed his testifying.  The trial court questioned the Petitioner further to ensure that the Petitioner understood that the decision to testify was his to make and that no one could prevent him from testifying.  The trial court also asked the Petitioner whether he and counsel had discussed the advantages and disadvantages of his testifying to ensure that his decision was made knowingly and voluntarily.  The record supports the post-conviction court's findings on this issue.  The Petitioner failed to carry his burden of proof and is not entitled to relief.

*(vii) Failure to present exonerating evidence prejudiced the Petitioner:*

The Petitioner argues that the proffered testimony of Debra Slate, a juror at his trial, that her review of transcripts of post-conviction witnesses' testimonies would have given her doubt as to the Petitioner's guilt, proves that the allegations of deficient performance were prejudicial.  The State argues that Slate's testimony is unpersuasive because she testified after only considering the post-conviction testimony – 13 years after the original trial – and without reviewing any of the original trial evidence.

The post-conviction court sustained the State's objection to Slate's testimony as irrelevant.  The post-conviction court, however, allowed the Petitioner to present an offer of proof.  On appeal, the Petitioner does not argue that the post-conviction erred by excluding Slate's testimony.  Rather, the Petitioner argues that Slate's testimony established prejudice.  Because the post-conviction court only permitted an offer of proof,

the court made no explicit finding concerning her testimony in its findings of facts and conclusions of law. In our view, the trial court did not abuse its discretion by excluding her testimony. Her testimony was based upon her review of the transcripts of the post-conviction testimony of several witnesses, and not an overall review of the trial evidence. She was unable to observe the witnesses and was, therefore, unable to assess their credibility. The trial court notably found Heard's and the Petitioner's testimonies lacked credibility. Even if the court were to consider Slate's testimony as some proof of prejudice, we have already concluded that the Petitioner failed to establish deficient performance to support his allegations of ineffective assistance of counsel. Therefore, the Petitioner cannot establish his claim of ineffective assistance of counsel through Slate's testimony.

### Perjured Testimony

As a free-standing claim apart from his allegations of ineffective assistance of counsel, the Petitioner argues that Kimberly Ann Bowman committed perjury at trial based upon her post-conviction hearing testimony that Chattin threatened her to prevent her from testifying that she overheard him confess to killing Deputy Bond. The State argues that Bowman's recanted testimony is not apt for post-conviction proceedings. Rather, the evidence could be considered in a petition for writ of error coram nobis.

The post-conviction court disposed of this allegation by separate order concerning the related error coram nobis petition, which is currently pending appellate review in a separate case. That said, this court has previously held that claims of recantation are generally not proper for post-conviction review. "[R]ecanted testimony amounts to no more than a request to relitigate the sufficiency of the evidence at trial and is not a proper subject of post-conviction relief." Teresa Deion Smith Harris v. State, W2000-02611-CCA-R3-PC, 2001 WL 892848 at *1 (Tenn. Crim. App., at Jackson, Aug. 2, 2001) (citations omitted) perm. app. denied (Tenn. Dec. 17, 2001). The Petitioner does not allege that the State knowingly presented false testimony and, if he had, the record simply does not support such a claim. The Petitioner is not entitled to post-conviction relief as to this claim.

### Recusal of Trial Judge

Next, the Petitioner argues that recusal of the trial judge was required due to the his inappropriate relationship with a victim-witness coordinator from the District Attorney General's Office. The State argues that, as a free-standing claim, the allegation is waived for failure to raise it at trial or on direct appeal. In his reply brief, the Petitioner asserts, without citation to authority, that "a trial before an impartial judge is a fundamental Constitutional right that cannot be waived." The State further asserts that

the Petitioner failed to establish that counsel's failure to file a motion to recuse constituted deficient performance.

The post-conviction court accredited Cindy Richardson's testimony that she did not work on the Petitioner's case, did not discuss the case with the trial judge, and did not engage in an improper relationship with the trial judge. The post-conviction court found Hill's testimony concerning Richardson's alleged admission lacked credibility due to the passage of time and the fact that everyone was consuming alcohol when the disclosure was allegedly made. Essentially, the post-conviction court ruled that the Petitioner failed to establish by clear and convincing evidence that an inappropriate relationship had occurred requiring the trial judge's recusal. The evidence does not preponderate against the post-conviction court's finding that no inappropriate relationship occurred requiring the trial judge to sua sponte recuse. The Petitioner is not entitled to relief as to this free-standing claim.

As to any claim that counsel were ineffective for failing to file a motion to recuse, Green testified that the District Attorney General's Office informed them of the circumstances of Richardson's resignation and that she did not feel it necessary to file a motion to recuse because she "did not believe that anybody could have sway over" the trial judge. Richardson testified that she did not work on the Petitioner's case and that no inappropriate relationship occurred. We have already concluded that the evidence does not preponderate against the post-conviction court's findings. Therefore, even if analyzed as an ineffective assistance of counsel claim, we conclude that the Petitioner failed to establish deficient performance or prejudice as to this allegation.

**Newly Discovered Evidence**

The Petitioner argues that Kimberly Bowman's testimony at the post-conviction hearing that Chattin admitted to her that he killed Deputy Bond qualifies as newly discovered evidence requiring a new trial. Additionally, he contends that Lisa Gray's testimony at the post-conviction hearing that Chattin told her about his ex-wife's having an affair with a police officer and, when asked if he killed Deputy Bond, Chattin did not deny doing so qualifies as newly discovered evidence. Likewise, the parties stipulated at the post-conviction hearing that Roberta Lynn Pardue would have testified that Chattin was abusive to her and that he admitted to shooting a police officer when he and another individual went to burn down the fruit stand. The State argues that this claim is more apt for a petition for writ of error coram nobis. Further, both Gray's and Pardue's testimonies are cumulative to much of the trial testimony concerning Chattin, which was ultimately rejected by the jury.

The post-conviction court disposed of this allegation by separate order concerning the related error coram nobis petition, which is currently pending appellate review in a separate case. That said, this court has previously held that claims of actual innocence not based on newly discovered scientific evidence are not cognizable in a petition for post-conviction relief. See Shaun Alexander Hodge v. State, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503, at *7-8 (Tenn. Crim. App. Aug.26, 2011), perm. app. denied, (Tenn. Feb. 15, 2012); James W. Vanover v. State, No. E2010-00203-CCA-R3-PC, 2011 WL 3655136, at *5 (Tenn.Crim.App. Aug.19, 2011), perm. app. denied, (Tenn. Oct. 18, 2011); see also Dellinger, 279 S.W.3d at 291 n.7 (holding that claims of actual innocence based upon newly discovered scientific evidence may be raised in a petition for post-conviction relief, but noting that claims of actual innocence not based on new scientific evidence should be raised in a petition for writ of error coram nobis or in an application for executive clemency). Accordingly, this issue is without merit.

## CONCLUSION

For the foregoing reasons, we conclude that the post-conviction court did not err by denying post-conviction relief to the Petitioner. The Petitioner failed to establish any of his claims by clear and convincing evidence. The judgment of the Hamilton County Criminal Court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE